**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

```
-----------------------------x
                             :
ARRIGONI ENTERPRISES, LLC,   :
     Plaintiff,              :
                             :
v.                           :      Civil No. 3:08cv520(AWT)
                             :
TOWN OF DURHAM, DURHAM       :
PLANNING & ZONING COMMISSION, :
and DURHAM ZONING BOARD OF   :
APPEALS,                     :
     Defendants.             :
                             :
-----------------------------x
```

<u>**RULING ON MOTIONS FOR SUMMARY JUDGMENT**</u>

The plaintiff, Arrigoni Enterprises, LLC ("Arrigoni"), brings this action against the defendants, the Town of Durham, the Durham Planning & Zoning Commission, and the Durham Zoning Board of Appeals, alleging constitutional violations stemming from adverse zoning decisions relating to the plaintiff's proposed development of a parcel of land. The plaintiff brings claims, pursuant to 42 U.S.C. § 1983, for denial of equal protection of the law (Count One), and for denial of substantive due process (Count Two), and it also seeks a declaratory judgment that the challenged zoning regulation is impermissibly vague (Count Four)[1]. The defendants raise affirmative defenses as to each claim. The plaintiff and the defendants have each moved for summary judgment. The defendants' motion is being granted as to

---

[1] Count Three, was dismissed by the court. (<u>See</u> Doc. No. 32)

the plaintiff's substantive due process claim (Count Two) and as to all claims against the Town of Durham.  The plaintiff's motion is being granted as to the defendants' affirmative defenses.

## I.   FACTUAL BACKGROUND

Arrigoni is a limited liability company organized and existing under the laws of the State of Connecticut.  Arrigoni is the owner of a parcel of land located on the west side of Mountain Road in the Town of Durham (the "Property").  The Town of Durham (the "Town") is a municipal corporation in Middlesex County.  The Planning & Zoning Commission (the "PZC") exists pursuant to Chapter 124 of the Connecticut General Statutes and Section 6.4 of the Charter of the Town of Durham and is responsible for implementing the Town's Zoning Regulations (the "Regulations").  The Zoning Board of Appeals (the "ZBA") exists pursuant to Chapter 126 of the Connecticut General Statutes and Section 6.5 of the Charter of the Town of Durham and is responsible for, inter alia, granting variances to the Regulations.

The Property is a heavily wooded and undeveloped parcel of land which has been owned by Arrigoni and the Arrigoni family since 1955.  The topography of the Property is very steeply sloped upward westerly from Mountain Road and consists mainly of rock and ledge. The Property is located in Durham's only Design Development District ("DDD") zone.

The DDD zone is one of three industrial zones in Durham, with the other two being the Light Industrial District ("LID") zone and the Heavy Industrial District ("HID") zone. The Property lies between the Tilcon Quarry property, which is zoned HID and DDD, to the northwest, west, and south, and two residential properties, one to the north, zoned Farm Residential ("FR"), and a non-conforming residential property located in the DDD zone.

Prior to 1986, all of the parcels currently located in the DDD zone, including the Property, were zoned FR. In June 1986, the PZC changed the zoning of the Property to LID. One of the purposes of this change was to harmonize the conflicting HID activities of the Tilcon Quarry operations with those of the FR zone by creating a light industrial buffer around the dwellings along the west side of Mountain Road.

The Regulations were changed again effective January 1988, and the Property was changed from an LID zone to a DDD zone, which is its current status. With respect to this zone, the Regulations permit only a limited number of types of light industrial uses, require that buildings be 5,000 square feet in size or greater, and impose limitations on, among other things, coverage and setbacks.

In 1992, several of the property owners on Mountain Road, including the owners of the Property, sought to have their

parcels changed back from DDD to the original FR zone, claiming that they were not aware of the zoning changes from FR to LID and from LID to DDD.  This attempt was unsuccessful because the PZC, as well as various members of the community and town organizations, indicated the importance of maintaining the industrial zoning of the Property.

In 2005, Arrigoni sought to have the zone for the Property changed from DDD to HID.  The purpose of this request was to enable Arrigoni to excavate, crush, and remove the amount of earth material necessary for it to construct three light industrial buildings.  It represented to the PZC that such earth processing and rock crushing was necessary to prepare the site for development of these light industrial buildings and that the HID zone is the only zone in Durham in which rock crushing is a permitted use under the Regulations.  This request was denied in May 2005.

On September 13, 2005, Arrigoni applied to the PZC for a special development permit to develop the site and to construct three industrial buildings on the Property.  The three buildings were to be 8,750 square feet, 10,000 square feet, and 11,250 square feet.

Under the Regulations, property uses in a DDD zone are restricted to a finite list and are "subject to the issuance of a special exception in accordance with . . . the Durham Zoning

-4-

Regulations." (Defs.' Mot. Summ. J. (Doc. No. 70), Ex. B, § 7.04.04.) Thus, all development in DDDs must be in conformance with the regulations governing that zone and also with the regulations governing special development permits. The general standards governing special development permits are set forth in § 13.05.04 of the Regulations, which reads:

> The Commission shall approve an application to permit establishment of a use for which a special exception is required if it shall find that the proposed use and the proposed buildings and structures will conform to the following standards in addition to such special standards for particular uses as may be imposed:

> 1.   The location, type, character and size of the use and of any building or other structure in connection therewith shall be in harmony with and conform to the appropriate and orderly development of the town and the neighborhood and will not hinder or discourage the appropriate development and use of adjacent lots or impair the value thereof;

> 2.   The nature and location of the use and of any building or other structure in connection therewith shall be such that there will be adequate access to it for fire protection purposes;

> 3.   The streets serving the proposed use are adequate to carry prospective traffic, that provision is made for entering and leaving the property in such a manner that no undue traffic hazard or congestion will be created; . . .

> 8.   The special exception use shall not constitute a hazard to public health and safety either on or off the Subject Property.

-5-

purpose of serving the goals of the Regulations.

At the public hearings, there was opposition voiced against the proposed excavation by citizens and PZC members based on the effects of the proposed development on the health, safety and public welfare of Arrigoni's residential neighbors.  Citizens also voiced concerns over the large scale of the proposed excavation, the permissibility of processing of earth materials in the DDD zone, and the possibility that Arrigoni planned to conduct a quarrying enterprise on the site.

On December 21, 2005, the PZC closed the public hearings on both the special development permit and excavation permit applications.  The PZC then voted unanimously (with Commissioner Russell abstaining) to deny both applications.  A member of the PZC noted that "the three buildings necessitate site work exceeding any reasonable norms.  Perhaps a revision could be developed that will not necessitate draconian methods of site preparation and enable the site to conform to the zone."  (Pl.'s Mot. Summ. J. (Doc. No. 65), Ex. 22.)

Arrigoni appealed the denials to the Connecticut Superior Court, arguing that the PZC acted illegally and arbitrarily in denying both applications and claiming a violation of its constitutional rights.  On February 15, 2007, the Superior Court upheld the PZC's denial of both permit applications without specifically addressing Arrigoni's constitutional claims.

Arrigoni moved the Superior Court to reopen so it could re-argue its constitutional claims, but its motion was denied on March 19, 2007.  Arrigoni immediately sought and was denied certification to the Connecticut Appellate Court to appeal the Superior Court's decision.

In August 2007, Arrigoni sought a variance from the ZBA to § 12.05 of the Regulations, which prohibits the crushing of rock. The basis of the request was that the geology and topography of the Property was such that any development would require the excavation, crushing and removal of rock.  The ZBA planned a public hearing on Arrigoni's variance application on August 9, 2007.

On August 7, 2007, upon learning of the Arrigoni's variance application, the PZC instructed its secretary to amend and expand on the draft minutes previously prepared for the PZC's July 18, 2007 meeting to reflect the PZC's discussion and concern over the possibility of Arrigoni receiving a variance, and to prepare a letter to the ZBA explaining the PZC's opposition to Arrigoni's variance application.  It is unclear, however, whether these materials were eventually sent to or considered by the ZBA.

In addition to communicating its position relative to the Plaintiff's variance application by means of its amended minutes, the PZC instructed one of its members, Eugene C. Riotte Jr., to attend the August 9, 2007 ZBA meeting and voice the PZC's

opposition to Arrigoni's application. The PZC had, several times in the past, designated one of its members as a liaison to monitor variance applications before the ZBA.

At the August 9, 2007 ZBA meeting, Riotte, appearing in his official capacity as a member of the PZC, attempted to address the ZBA to voice the PZC's position on the application for a variance. Counsel for Arrigoni indicated at that time that Riotte's testimony would be in violation of state law.  Riotte sat down and was not allowed to speak regarding the application.

At the ZBA public hearing, numerous citizens expressed their concerns about the proposed variance, including concerns with dust suppression from the excavation of the rock and excessive noise from blasting.  Citizens were particularly concerned about the effects of Arrigoni's activities in light of the problems a similar previous land excavation by Greenland Realty, LLC ("Greenland Realty"), located near the Property, had caused.  At the conclusion of the hearing, the ZBA voted unanimously (with one member recusing himself) to deny the variance application.

In the past, the PZC has allowed rock crushing on sites when proposed as part of a site development.  In 2003, the PZC approved the excavation of a substantial amount of earth material and the blasting, excavation and removal of rock in a residential zone, in order to enable the applicant to construct a driveway several hundred feet in length.

-9-

In 2004, the PZC approved the construction of two industrial buildings (one 8,000 square foot office and cold storage building and one 5,000 square foot warehouse) by Nosal Enterprises, LLC ("Nosal"), which is located within the DDD zone. Like the Property, Nosal's property is steeply sloped and required the crushing of rock before it could be developed. During its site preparation work, Nosal crushed and processed rock without a special permit.

During the period from December 2004 to September 2005, the PZC granted two separate site plan review approvals to Greenland Realty to excavate, crush, screen and remove rock and earth material in excess of 20,000 cubic yards of rock from its property in order to build one light industrial building 9,600 square feet in size. As part of the preparation of the site for the construction of the one light industrial building, Greenland Realty eventually excavated, crushed and removed in excess of 30,000 cubic yards of rock and earth material from its site. Greenland Realty's property is located directly across the street from the Property and Nosal's property is located on the next street over from Mountain Road. Both Nosal's property and Greenland Realty's property are located in the same DDD zone.

## II.  <u>LEGAL STANDARD</u>

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact

to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law.  Fed. R. Civ. P. 56(c).  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223 (2d Cir. 1994).  Rule 56(c) "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp., 477 U.S. at 322.

When ruling on a motion for summary judgment, the court must respect the province of the jury.  The court, therefore, may not try issues of fact.  See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987); Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975).  It is well-established that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge."  Anderson, 477 U.S. at 255.  Thus, the trial court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined . . . to issue-finding; it does not extend to issue-resolution."  Gallo, 22 F.3d at 1224.

Summary judgment is inappropriate only if the issue to be

resolved is both genuine and related to a material fact.
Therefore, the mere existence of some alleged factual dispute
between the parties will not defeat an otherwise properly
supported motion for summary judgment.  An issue is "genuine
. . . if the evidence is such that a reasonable jury could return
a verdict for the nonmoving party."  Anderson, 477 U.S. at 248
(internal quotation marks omitted).  A material fact is one that
would "affect the outcome of the suit under the governing law."
Id.  As the Court observed in Anderson: "[T]he materiality
determination rests on the substantive law, [and] it is the
substantive law's identification of which facts are critical and
which facts are irrelevant that governs."  Id.  Thus, only those
facts that must be decided in order to resolve a claim or defense
will prevent summary judgment from being granted.  When
confronted with an asserted factual dispute, the court must
examine the elements of the claims and defenses at issue on the
motion to determine whether a resolution of that dispute could
affect the disposition of any of those claims or defenses.
Immaterial or minor facts will not prevent summary judgment.  See
Howard v. Gleason Corp., 901 F.2d 1154, 1159 (2d Cir. 1990).

When reviewing the evidence on a motion for summary
judgment, the court must "assess the record in the light most
favorable to the non-movant and . . . draw all reasonable
inferences in its favor."  Weinstock v. Columbia Univ., 224 F.3d

33, 41 (2d Cir. 2000) (quoting Delaware & Hudson Ry. Co. v. Consol. Rail Corp., 902 F.2d 174, 177 (2d Cir. 1990)).  Because credibility is not an issue on summary judgment, the nonmovant's evidence must be accepted as true for purposes of the motion. Nonetheless, the inferences drawn in favor of the nonmovant must be supported by the evidence.  "[M]ere speculation and conjecture is insufficient to defeat a motion for summary judgment."  Stern v. Trustees of Columbia Univ., 131 F.3d 305, 315 (2d Cir. 1997) (internal quotation marks omitted) (quoting Western World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d. Cir. 1990)). Moreover, the "mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which [a] jury could reasonably find for the [nonmovant]."  Anderson, 477 U.S. at 252.

Finally, the nonmoving party cannot simply rest on the allegations in its pleadings since the essence of summary judgment is to go beyond the pleadings to determine if a genuine issue of material fact exists.  See Celotex Corp., 477 U.S. at 324.  "Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact," Weinstock, 224 F.3d at 41, if the movant demonstrates an absence of such issues, a limited burden of production shifts to the nonmovant, who must "demonstrate more than some metaphysical doubt as to the material facts, . . . [and] must come forward

with specific facts showing that there is a genuine issue for trial." Aslanidis v. United States Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993)(quotation marks, citations and emphasis omitted). Furthermore, "unsupported allegations do not create a material issue of fact." Weinstock, 224 F.3d at 41.  If the nonmovant fails to meet this burden, summary judgment should be granted.

III. **DISCUSSION**

   A.   **Whether PZC and ZBA are Proper Defendants;
        Claims Against the Town**

        The defendants argue that the PZC and ZBA are not proper defendants because Conn. Gen. Stat. §§ 8-1 and 8-6 do not explicitly establish them as legal entities capable of bringing suit or being sued.  The plaintiff argues that the PZC and ZBA are "persons" within the meaning of 42 U.S.C. § 1983 and as established by Monell v. New York City Department of Social Services, 436 U.S. 658 (1978).

        In Monell, the Supreme Court overruled Monroe v. Pape, 365 U.S. 176 (1961), insofar as it stood for the proposition that local governments enjoyed immunity from suit under the Eleventh Amendment.  See Monell, 436 U.S. at 663.  The Court stated:

> Our analysis of the legislative history of the
> Civil Rights Act of 1871 compels the
> conclusion that Congress did intend
> municipalities and other local government
> units to be included among those person to
> whom § 1983 applies.  Local governing bodies,
> therefore, can be sued directly under § 1983

-14-

> for monetary, declaratory, or injunctive
> relief where, as here, the action that is
> alleged to be unconstitutional implements or
> executes a policy statement, ordinance,
> regulation, or decision officially adopted and
> promulgated by that body's officers.

Id. at 690.  This statement was later clarified in Pembaur v.

City of Cincinnati, where the Court explained:

> The power to establish policy is no more the
> exclusive province of the legislature at the
> local level than at the state or national
> level.  Monell's language makes clear that it
> expressly envisioned other officials "whose
> acts or edicts may fairly be said to represent
> official policy," and whose decisions
> therefore may give rise to municipal liability
> under § 1983.

475 U.S. 469, 480 (1986) (quoting Monell, 436 U.S. at 694).

Furthermore, "[a]uthority to make municipal policy may be granted

directly by a legislative enactment or may be delegated by an

official who possesses such authority, and of course, whether an

official had final policymaking authority is a question of state

law."  Id. at 483.

     Chapter 124 of the Connecticut General Statutes empowers

"any municipality, . . . by vote of its legislative body" to

"adopt the provisions of this chapter and exercise through a

zoning commission the powers granted hereunder."  Conn. Gen.

Stat. § 8-1 (2011).  These powers, delineated in § 8-2 et seq.,

include the power "to regulate, within the limits of such

municipality, the height, number of stories and size of buildings

and other structures . . . ."  Conn. Gen. Stat. § 8-2(a) (2011).

The preamble to the Regulations specifies that "[t]hese
regulations are issued under the provisions of Chapter 124 of the
General Statutes, as amended, and are in conformity with the
purposes expressed therein."  Durham, Conn., Zoning Regulations
§ 01.01 (2011) (section unchanged since Regulations were
adopted).

In Thomas v. City of West Haven, the Connecticut Supreme
Court noted that Monell provides that "local governing bodies can
be sued directly under § 1983 for monetary, declaratory or
injunctive relief where the action that is alleged to be
unconstitutional implements or executes a policy statement,
ordinance, regulation, or decision officially adopted and
promulgated by that body's officers."  249 Conn. 385, 410 (1999)
(quoting Monell, 436 U.S. at 694) (internal quotation marks and
ellipses omitted).  In determining that the Zoning Commission of
the City of West Haven had discretion to make municipal policy on
the subject of zoning, the court noted, "[o]ur statutes delegate
great authority to local zoning commissions."  Thomas, 249 Conn.
at 414 n.26.  The court observed that Chapter 124 of the
Connecticut General Statutes:

> [delegates] all the available state statutory
> powers to the commission.  Thus, there is no
> question that, at least for the purposes of
> establishing a prima facie case, the inference
> can be drawn that the commission acted as a
> policy maker for the city with regard to
> denying the plaintiff's zone change
> application.

-16-

Id.  Also, it is well-settled that a zoning commission "in exercising its power to adopt zoning regulations acts as a legislative body."  Damick v. Planning and Zoning Comm'n, 158 Conn. 78, 81 (1969); see also Steiner, Inc. v. Town Plan and Zoning Comm'n, 149 Conn. 74, 75 (1961); Burke v. Bd. of Representatives, 148 Conn. 33, 39 (1961).  Thus, under Connecticut law, zoning commissions acting pursuant to Chapter 124 of the Connecticut General Statutes, such as the PZC, are local governing bodies which can be sued directly where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."  Monell, 436 U.S. at 690.

This reasoning applies with equal force to the ZBA, the creation of which is provided for in Connecticut General Statutes § 8-5, and which is granted the authority to "(1) hear and decide appeals where it is alleged that there is an error in any order . . . ; (2) to hear and decide all matters including special exceptions and special exemptions . . . ; [and] (3) to determine and vary the application of the zoning bylaws, ordinances or regulations in harmony with their general purpose . . . ."  Conn. Gen. Stat. § 8-6 (2011).

The defendants cite to cases that stand for the proposition that municipal departments cannot be sued under § 1983 because

-17-

they are not independent legal entities.  See, e.g., Nicholson v. Lenczewski, 356 F. Supp. 2d 157, 164 (D. Conn. 2005) (noting that "[a] municipal police department is a sub-unit or agency of the municipal government through which the municipality fulfills its policing function").  However, Thomas is directly on point. Zoning commissions function legislatively when adopting zoning regulations and holding public hearings for the adjudication of individual petitions for zoning redress.

Arrigoni contends that it has alleged a Monell claim against the Town.  However, Arrigoni premises its Monell claim against the Town on customs and/or policies of the PZC and/or the ZBA. It identifies no official policy or custom of the Town. (See Opp. to Defs.' Mot. Summ. J. (Doc. No. 78) at 22-23. "[A] municipality cannot be held liable under § 1983 on a respondeat superior theory." Monell, 436 U.S. at 691.  Arrigoni has established that the PZC and the ZBA are entities that can themselves be sued, so he is not suing the Town on the theory that the PZC and ZBA are sub-units or agencies of the Town.  Therefore, the Town is entitled to summary judgment as to all claims against it.

   **B.   Count One: Equal Protection**

Arrigoni claims that the defendants violated its right to equal protection under the Fourteenth Amendment to the United States Constitution.  The Fourteenth Amendment provides that "[n]o state shall . . . deny to any person within its

-18-

jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  Arrigoni proceeds under a "class of one" theory, claiming that it "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (citing Sioux City Bridge Co. v. Dakota Cnty., 260 U.S. 441 (1923)); see also Clubside, Inc. v. Valentin, 468 F.3d 144, 159 (2d Cir. 2006) ("In [Village of Willowbrook], the Supreme Court recognized that plaintiffs state an equal protection claim where they allege that they were intentionally treated differently from other similarly-situated individuals without any rational basis.").

The Second Circuit has held that "class-of-one plaintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves." Clubside, 468 F.3d at 159; see also Neilson v. D'Angelis, 409 F.3d 100, 104 (2d Cir. 2005).  This stringent standard is imposed because:

> the existence of persons in similar circumstances who received more favorable treatment than the plaintiff is offered to provide an inference that the plaintiff was intentionally singled out for reasons that so lack any reasonable nexus with a legitimate governmental policy that an improper purpose-- whether personal or otherwise--is all but certain.

Nielson, 409 F.3d at 105.  Thus, to prevail on a class of one

-19-

claim, a plaintiff must show that:

> (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake.

Nielson, 409 F.3d at 105. "Generally, whether the parties are similarly situated is a fact-intensive inquiry." Clubside, 468 F.3d at 159 (citing Harlen Assocs. v. Inc. Village of Mineola, 273 F.3d 494, 499 n.2 (2d Cir. 2001)).

Arrigoni identifies two parcels it claims are similarly situated to the Property: a nearby parcel owned by Greenland Realty (the "Greenland Parcel"), and another nearby parcel owned by Nosal (the "Nosal Parcel").[2]  Arrigoni claims the Property is similar to the those properties, noting:

> All three properties are located in the same DDD zone and the same regulations apply to each property. . . . All of these properties were wooded, steeply sloped, and undeveloped. All three properties sought the construction of one or more large industrial buildings in conformity with the zoning regulations.  All three properties required extensive site work in order to develop them.

(Pl.'s Mot. Summ. J. (Doc. No. 65), 11.)  However, owners of the Greenland Parcel and the Nosal Parcel, in contrast to the

---

[2]The plaintiff also points to a property on New Haven Road (the "New Haven Road Parcel") to show the PZC's policy of allowing rock excavation in the context of site preparation.

plaintiff, were (1) not required to apply for a special excavation permit, and (2) were allowed to crush and process rock in order to develop their properties.  The defendants dispute that these parcels are similarly situated to the Property, and contend that a rational basis for prohibiting the proposed development of the Property exists.

The Greenland Parcel is located directly across the street from the Property.  In 2005, the PZC granted Greenland Realty's request for a special permit for the construction of an office building and garage with outdoor storage area.  Like Arrigoni, Greenland Realty sought to construct an industrial building and to create a large yard area for the storage of vehicles and equipment on its property.  This required extensive excavation of earth, because the Greenland Parcel, like the Property, was situated on a heavily wooded rocky incline.

The Nosal Parcel is located in the same industrial neighborhood as the Property, although one street over.  In 2004, Nosal sought and was granted a special permit to develop its industrial site with two buildings.  Like the Greenland Parcel and the Property, the Nosal Parcel also required extensive excavation.[3]

The scale of these projects was noticeably different from

---

[3]Nosal, however, did not seek approval for the excavation and crushing of rock required to develop its property, and after the PZC received a complaint about these activities, it issued a cease and desist letter instructing Nosal to stop any crushing activity.

the scale of Arriogni's project.  The Greenland Realty application proposed the development of a 4.87 acre parcel of property, requiring the excavation of approximately 20,000 cubic yards of material for the construction of one 9,000 square foot building.  The Nosal application proposed the development of a 5.69 acre parcel of property to build one 8,000 square foot building and one 5,000 square foot building, totaling 13,000 square feet of industrial space.  By contrast, the Arrigoni plan proposed the development of a 9.1 acre parcel of property, requiring the excavation of approximately 70,000 cubic yards of material for the construction of three buildings totaling 30,000 square feet.

Arrigoni contends that while the proposed development of the Property is considerably larger than that of either Greenland Realty or Nosal, absolute differences in the size of the development is not the significant factor here in determining whether the properties are similarly situated because the Regulations speak in terms of percentage of lot coverage, not the size of the development.  Arrigoni properly points out that § 07.04.03 restricts maximum lot coverage to 50%; there is no restriction on the number and size of the buildings, nor on the amount of acreage that may be developed.  By this measure, Greenland Realty's lot coverage ratio was 46%, and Nosal's lot coverage ratio was 32% whereas Arrigoni's proposed lot coverage

ratio was 31.8%.  Additionally, Arrigoni has produced evidence
that the absolute figures with respect to amount of rock to be
excavated from the respective sites is not a significant factor
because neither Nosal nor Greenland Realty were required to apply
for an excavation permit.  Arrigoni argues that, therefore, the
PZC necessarily did not consider those figures when deciding
whether to grant the applications by Greenland Realty or Nosal.
In addition, Arrigoni has produced evidence that the Property is
similar to the  Greenland Parcel and the Nosal Parcel in terms of
close proximity, identical zoning, intended type of development,
and topographical features.

     "[A]s a general rule, whether items are similarly situated
is a factual issue that should be submitted to the jury."
Harlen, 273 F.3d at 499.  The court concludes that genuine issues
of material fact exist as to whether Arrigoni is similarly
situated with comparators and as to whether the similarity in
circumstances and difference in treatment are sufficient to
exclude the possibility that the defendants acted on the basis of
mistake.  Therefore, both parties' motions for summary judgment
as to this claim are being denied.[4]

---

    [4]The defendants argue that a third step for class of one analysis--
whether any difference in treatment was the result of non-discretionary
action--must be applied pursuant to United States v. Engquist, 553 U.S. 591
(2008).  The court disagrees.  In Analytical Diagnostic Labs, Inc. v. Kusel,
626 F.3d 135 (2d Cir. 2010), the Second Circuit stated:

          We join the Seventh Circuit in holding that Engquist
          does  not  bar  all  class-of-one  claims  involving
          discretionary state action.  While there may be some

C. __Count Two: Substantive Due Process__

The plaintiff claims that the PZC's denial of its application for a special development permit was a violation of its right to substantive due process.  To prevail on this claim Arrigoni must show "(1) that [it] had a valid property interest in the granting of the [application], and (2) that the defendants infringed that property interest in an arbitrary or irrational manner."  Harlen, 273 F.3d 494, 503 (2d Cir. 2001); see also Clubside, 468 F.3d at 152.

"When a landowner alleges that he has been deprived of property in violation of the due process clause by the actions of a state zoning authority, we begin our inquiry by determining whether a constitutionally cognizable property interest is at stake."  Villager Pond, Inc. v. Town of Darien, 56 F.3d 375, 378 (2d Cir. 1995).  In this Circuit the "clear entitlement" analysis is applied to determine this question.  The analysis is derived from the Supreme Court's decision in Board of Regents v. Roth,

_____

circumstances where Engquist is properly applied outside the employment context, the case before us is not one of them.  Critically, the state defendants here exercised the state's regulatory power.  As the Engquist court recognized, there is a:

crucial difference, with respect to constitutional analysis, between the government exercising the power to regulate or license, as a lawmaker, and the government acting as proprietor, to manage its internal operations.

Id. at 142 (quoting Engquist, 553 U.S. at 598).  In the present case, the defendants were not only not acting as an employer, but moreover were acting in a regulatory capacity with respect to the plaintiff.

which held that "[t]o have a property interest in a benefit, a
person clearly must have more than an abstract need or desire for
it.  He must have more than a unilateral expectation of it.  He
must, instead, have a legitimate claim of entitlement to it." 408
U.S. 564, 577 (1972).  "An applicant for a governmental permit
has a protected property interest in the permit being sought only
where 'the applicant has a clear entitlement to the approval
being sought from the governmental official or administrative
body.'" Villager Pond, 56 F.3d at 378 (quoting Walz v. Town of
Smithtown, 46 F.3d 162, 168 (2d Cir. 1995).  This inquiry focuses
"primarily on the degree of discretion enjoyed by the issuing
authority, not the estimated probability that the authority will
act favorably in a particular case."  RRI Realty Corp. v. Inc.
Village of Southampton, 870 F.2d 911, 918 (2d Cir. 1989).

     "Property interests . . . are not created by the
Constitution" but rather "they are created and their dimensions
are defined by existing rules or understandings that stem from an
independent source such as state law . . . ."  Roth, 408 U.S. at
577.  The Connecticut Supreme Court has previously "recognized
that the special permit process is, in fact, discretionary."
Irwin v. Planning and Zoning Comm'n, 244 Conn. 619, 626 (1998)
(citing Whisper Wind Dev. Corp. v. Planning & Zoning Comm'n, 229
Conn. 176, 177 (1994)); see also Double I Ltd. P'ship v. Plan &
Zoning Comm'n, 218 Conn. 65, 72 (1991) ("In applying the law to

-25-

the facts of a particular case, the board is endowed with liberal discretion, and its action is subject to review by the courts only to determine whether it was unreasonable, arbitrary or illegal.") (internal citations and quotations omitted). "[G]eneral considerations such as public health, safety and welfare, which are enumerated in the zoning regulations, may be the basis for the denial of a special permit." Irwin, 244 Conn. at 627. This court as well has previously held that "under Connecticut law, the Commission [has] discretion to determine whether Plaintiffs' special use permit proposal satisfie[s] the relevant standards set forth in the Zoning Regulations." Merry Charters, LLC v. Town of Stonington, 342 F. Supp. 2d 69, 80 (D. Conn. 2004).

Moreover, the section of the Regulations governing special development permits states, in pertinent part:

> The Commission shall approve an application to permit establishment of a use for which a special exception is required if it shall find that the proposed use and the proposed buildings and structures will conform to the following standards in addition to such special standards for particular uses as may be imposed:
>
> (1)   The location, type, character and size of the use and any building or other structure in connection therewith shall be in harmony with and conform to the appropriate and orderly development of the Town and the neighborhood and will not hinder or discourage the appropriate development and use of adjacent lots or impair the value thereof.

-26-

(Defs.' Mot. Summ. J. (Doc. No. 65), Ex. B, § 13.05.04.)  This section requires the PZC to evaluate subjective criteria, necessitating the exercise of discretion.  Cf. Conn. Health Facilities, Inc. v. Zoning Bd. of Appeals, 29 Conn. App. 1, 6-7 (1992) ("Connecticut courts have never held that a zoning commission lacks the ability to exercise discretion to determine whether the general standards in the regulations have been met in the special permit process . . . . If the special permit process were purely ministerial there would be no need to mandate a public hearing.")

The plaintiff cites Irwin for the proposition that "[a]lthough it is true that the zoning commission does not have discretion to deny a special permit when the proposal meets the standards, it does have discretion to determine whether the proposal meets the standards set forth in the regulations."  244 Conn. at 628 (emphasis in original).  The plaintiff argues that the Property met all the standards set forth in the Regulations, so the PZC lacked discretion to deny its special development permit application, and Arrigoni therefore had a property interest in its approval.  In support of this argument the plaintiff offers the deposition testimony of the Town Planner and the Town Engineer.[5]  Neither of these individuals was a member of

---

[5]The deposition testimony upon which the plaintiff relies is the following:

Brian Curtis, Town Engineer:

the PZC.  In addition § 12.05.03.01.03(B) expressly limits the
crushing and processing of earth products to the HID zone.
Arrigoni's site plan, which proposed to crush more than 70,000
cubic yards of rock was therefore not in compliance with
§ 12.05.03.01.03(B), which provides: "[n]o washing, crushing or
other forms of processing of earth products shall be conducted on
the premises unless located within a heavy industrial (HID) zone
. . ."  (Defs.' Mot. Summ. J. (Doc. No. 70), Ex. B, §
12.05.03.01.03(B).)  In fact, the plaintiff states that it sought
to have the zone changed from DDD to HID "in order to allow it to
excavate, crush and remove the amount of earth material necessary
for it to construct three (3) light industrial buildings because
such earth processing and rock crushing is necessary to prepare
the site for development of these light industrial buildings[.]"
(Pl.'s Amend. Compl. ¶ 19).

    Thus, the plaintiff does not have a constitutionally

---

Q:    Do you recall having any concerns regarding the Arrigoni
        Enterprises application as not meeting any of the engineering
        regulations set forth in the zoning regs?
A:    No, I am not aware of any areas where it did not comply.
. . .

Geoffrey Colegrove, Town Planner:

Q:    Do you recall if the special permit application submitted by Mr.
        Arrigoni . . . conformed to all of the necessary regulations for
        the development of a piece of property in conformity with the
        design development district?
A:    Yes.
. . .
Q:    So the site plan conformed with all the necessary design
        development district regulations?
A:    Yes.

(Pl.'s Mot. Summ. J. (Doc. No. 70), Ex. 4, 37, Ex. 5, 29.)

cognizable property interest in the granting of an application for a special development permit, and consequently cannot establish a violation of its right to substantive due process. Therefore, the defendants' motion for summary judgment is being granted as to Count Two.

D.   **Count Four: Declaratory Judgment**

The plaintiff seeks a declaratory judgment that the provisions in the Regulations that govern special exceptions are unconstitutionally vague.  A request for declaratory relief, however, does not "provide an independent cause of action."  In re Joint E & So. Dist. Asbestos Litig., 14 F.3d 726, 731 (2d Cir. 1993) "[D]eclaratory relief is not a claim but only a remedy that Congress has created so that the court may declare rights and other legal relations of any interest party seeking such declaration, whether or not further relief is or could be sought."  In re Methyl Tertiary butyl Ether Prods. Liab. Litig., 247 F.R.D. 420, 422 (S.D.N.Y. 2007).  Title 28 U.S.C. § 2201, which provides for declaratory relief, entitled "Creation of remedy," provides: "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration."  28 U.S.C. § 2201 (2011).  "However, a request for relief in the form of a declaratory judgment does not by itself

establish a case or controversy involving an adjudication of rights."  In re Asbestos Litig., 14 F.3d at 731.  "Therefore, a court may only enter a declaratory judgment in favor of a party who has a substantive claim of right to such relief."  Id. Arrigoni, has not established that it has a substantive claim of right to relief.

### E.    Affirmative Defenses

The plaintiff challenges the sufficiency of all of the defendants' affirmative defenses.  The defendants do not address the plaintiff's arguments with respect to their affirmative defenses.

"A motion for summary judgment is an appropriate mechanism to challenge an affirmative defense."  Fed. Deposit Ins. Corp. v. Haines, 3 F. Supp. 2d 155, 159 (D. Conn. 1997); see also Fed. Deposit Ins. Corp. v. Giammettei, 34 F.3d 51, 54 (2d Cir. 1994) ("Where a plaintiff uses a summary judgment motion, in part, to challenge the legal sufficiency of an affirmative defense . . . a plaintiff may satisfy its Rule 56 burden by showing that there is an absence of evidence to support an essential element of the non-moving party's case." (internal quotation marks and citation omitted)).

Because the defendants have not responded to the plaintiff's arguments with respect to the affirmative defenses, the court deems them abandoned.  See Carone v. Mascolo, 573 F. Supp. 2d

575, 591 ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.") (quoting Taylor v. City of New York, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003)); see also Bronx Chrysler Plymouth, Inc. v. Chrysler Corp., 212 F. Supp. 2d 233, 249 (S.D.N.Y. 2002) (dismissing breach of contractual duty of good faith claim as abandoned because plaintiff's summary judgment opposition papers made no argument in support of the claim at all).

## III. CONCLUSION

For the reasons set forth above, the plaintiff's Motion for Summary Judgment (Doc. No. 65) is hereby GRANTED in part and DENIED in part; it is granted with respect to the defendants' affirmative defenses.  Also, the defendants' Motion for Summary Judgment (Doc. No. 70) is hereby GRANTED in part and DENIED in part; it is granted with respect to the substantive due process claim (Count Two) and as to all claims against the Town.

It is so ordered.

Dated this 30th day of September, 2011, at Hartford, Connecticut.


                          _____
                              /s/AWT
                          Alvin W. Thompson
                       United States District Judge